Filed 10/16/20  P. v. Benavidez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E073092 |
| v. | (Super.Ct.No. INF065236) |
| FERNANDO ANTONIO BENAVIDEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  John D. Molloy, Judge. Affirmed.

Rachel Varnell, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Allison Acosta and Michael D. Butera, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Fernando Antonio Benavidez appeals from a trial court's order summarily denying defendant's petition for relief under Penal Code[1] section 1170.95. For the reasons set forth *post*, we affirm the trial court's order denying defendant's petition.

## FACTUAL AND PROCEDURAL HISTORY

A.      PROCEDURAL HISTORY

On January 3, 2012, a first amended information charged defendant with murder under section 187, subdivision (a) (count 1). The information also charged a codefendant with dissuading a witness under section 136.1, subdivision (c)(1) (count 2). As to count 1, the information alleged that the murder was committed while defendant and his codefendants were engaged in the commission of a robbery under section 190.2, subdivision (a)(17)(A).

After a jury trial, on April 3, 2012, the jury found defendant guilty as charged. The jury also found true the special circumstance allegation that the murder was committed during the course of a robbery.

On June 22, 2012, the trial court sentenced defendant to life without the possibility of parole.

Defendant appealed and we modified several fines but otherwise affirmed the judgment. (*People v. Dunson* (Feb. 26, 2015, case No. E056565 [nonpub. opn.].).)

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

On April 5, 2019, defendant filed a petition for resentencing under section 1170.95. On April 26, 2019, the People filed their response. Thereafter, defendant's appointed counsel filed a reply brief. Counsel represented defendant at the hearing on May 31, 2019. At the hearing, the trial court summarily denied the petition on the ground that the petition failed to set forth a prima facie case for relief.

On June 11, 2019, defendant filed a timely notice of appeal.

B.    FACTUAL HISTORY[2]

In November 2007, Robert Dunson and his sister, Jackie Dunson, lived in the ground floor studio apartment of a two-story duplex in Indio. Rogelio Zuniga and his girlfriend, M.J., lived in the vacant, second floor apartment above the Dunsons' apartment.

Defendant was Jackie's "on-again off-again" boyfriend and visited at the apartment occasionally, but did not stay there. Jackie was a prostitute, and defendant would bring her clients, or "dates."

In November 2007, Robert, Jackie, M.J. and Zuniga hung out together and smoked methamphetamine every day in the Dunsons' apartment. Defendant would join them a couple of times a week.

On November 25, 2007, M.J., Jackie, Robert, Zuniga and defendant were at the Dunsons' apartment. Defendant offered to find a date for Jackie and bring the date back to the apartment to have sex with Jackie. Robert proposed instead that they would bring

_____

[2] The factual background is taken from our opinion in the prior appeal, case No. E056565, which we took judicial notice of by order dated August 22, 2019.

a man "back to the apartment, beat his ass, rob him, and take all of his shit." Defendant agreed, as did Jackie. Zuniga said nothing. Defendant left the apartment and M.J. and Zuniga went to the upstairs apartment.

A surveillance videotape from the Spotlight 29 casino showed defendant entering the casino just after midnight during the morning of November 26, 2007. The victim, William Dobbs, entered the casino about 1:15 a.m. He walked around then walked outside; as he waited for the valet to bring his Cadillac Escalade, defendant stood near the doorway outside the casino, watching Dobbs. Dobbs left in the Escalade at 1:46 a.m.

Dobbs returned to the casino about 3:30 a.m. At 3:45 a.m., Dobbs met with defendant inside the casino. They talked briefly and then left together in the Escalade.

At some point that night or early morning, M.J. woke to the voice of a man in the Dunsons' apartment screaming: "Oh, God. Please help me." M.J. described the screaming as "gut wrenching," "like someone is in pain, like they were hurt [and] screaming for someone to help them." She also heard "very loud" sounds of banging on a wall downstairs, "like something pretty heavy slamming up against the wall." Zuniga told M.J. to go back to sleep, which she did.

T.S. was a prostitute who had known Jackie and Robert for approximately 20 years. In November 2007, she was living in a car but she had Jackie's permission to take showers at the Dunsons' apartment. In the predawn hours of November 26, 2007, T.S. walked to the Dunsons' apartment to take a shower. As she approached she saw defendant walking away from the apartment. T.S. testified at the preliminary hearing that it was defendant she saw; however, at trial T.S. testified she had "assumed" it was

4

defendant, but that after "getting [her] mind right" and off drugs, she remembered seeing defendant immediately before going to the Dunsons' apartment at a gas station almost two miles away.

As T.S. approached the apartment, she heard Jackie arguing, yelling, and crying. T.S. heard Jackie say, "he was acting stupid," and "[h]e doesn't want to give [the money] to her." A side door to the apartment was ajar. As T.S. passed by that door, she heard Robert yelling loudly and angrily, " '[g]et down, mother fucker' " and "[t]hese better be the right PIN numbers." T.S. watched Robert push a man to his knees. The man appeared to have blood under his chin. Robert then put a plastic bag over the man's head and used duct tape to secure the bag to the man's neck and face. As T.S. began to leave, she heard Robert say: "Come on, mother fucker. We're going for a ride." T.S. then left.

At 4:50 a.m. Jackie attempted to withdraw $500 from an ATM machine using Dobbs's bank card. The attempt was denied because it exceeded the daily withdrawal limit for the account. She then successfully withdrew $200 from the ATM. An attempt to obtain an additional $200 was denied. During the evening of November 26, 2007, three unsuccessful attempts to withdraw money with Dobbs's bank card were made.

M.J. went downstairs to the Dunsons' apartment the morning of November 27, where she saw Robert kneeling in a corner of the living room scrubbing the walls with bleach and pulling up carpet. He gave M.J. a bank card and a piece of paper with a PIN number written on it and told her to pull out as much money as she could and bring it back to him, and she would get "a little bit of money in return for going." M.J. looked at Zuniga; Zuniga said, "let's go."

5

Between 10:26 a.m. and 11:39 a.m. on November 27, M.J. and Zuniga used Dobbs's bank card to retrieve approximately $1,000 from different ATMs. M.J. put $300, one of the transaction receipts, the bank card, and the PIN number in a pocket; she ripped up the other transaction receipts and put the rest of the cash in her bra. When she and Zuniga returned to the Dunsons' apartment, she gave the receipt, $300, the bank card, and the PIN number to Robert. M.J. kept the remaining cash.

Dobbs's body was found on November 27 two miles from the Spotlight 29 casino; he had a black bag attached to his neck with red tape. A Spotlight 29 valet parking pass was in his pocket. He had been stabbed with a sharp instrument 14 times, mostly on his face and neck. His internal and external jugular veins and carotid artery were severed and his trachea was also severed, which would have made it impossible for him to breathe. He had bruises and abrasions on his face and scalp, and signs of blunt force trauma to his chest. He had four broken ribs, which caused ruptures to his liver and lung. The forensic pathologist who performed the autopsy on Dobbs described the injuries as "brutal," and said it "looked like perhaps some injuries were inflicted for the purpose of torture" and for "causing pain."

## DISCUSSION

On appeal, defendant challenges the trial court's summary denial of his section 1170.95 petition to vacate his murder conviction. Defendant argues that the evidence is insufficient to support a finding that he was a major participant who acted with reckless indifference to human life under *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

6

A.     LEGAL BACKGROUND

"In 2018 the Legislature enacted Senate Bill No. 1437 (2017-2018 Reg. Sess.) . . ., which abolished the natural and probable consequences doctrine. . . .  Under section 189, subdivision (e), as amended by Senate Bill No. 1437, a defendant is guilty of felony murder only if he:  actually killed the victim; directly aided and abetted or solicited the killing, or otherwise acted with the intent to kill; or 'was a major participant in the underlying felony and acted with reckless indifference to human life.' "  [Citations.]  The legislation also enacted section 1170.95, which established a procedure for vacating murder convictions for defendants who would no longer be guilty of murder because of the new law and resentencing those who were so convicted."  (*People v. Murillo* (2020) 54 Cal.App.5th 160, 166 (*Murillo*).)

"Section 1170.95 allows a defendant serving a sentence for felony murder who would not be guilty of murder because of the new law to petition for resentencing.  The statute requires a defendant to submit a petition affirming that he meets three criteria of eligibility:  (1) He was charged with murder in a manner 'that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine' [citation]; (2) He 'was convicted of' or pleaded guilty to 'first degree murder or second degree murder' [citation]; and (3) He 'could not be convicted of first or second degree murder because of changes to Section[s] 188 or 189 made effective' as a part of Senate Bill No. 1437 [citation].  As described above, those changes eliminated the natural and probable consequences doctrine as a basis for murder liability, and added a requirement for felony murder that a defendant must have been at least a

7

major participant in the underlying felony and have acted with reckless indifference to human life." (*Murillo*, *supra*, 54 Cal.App.5th at p. 166.)

Section 1170.95, subdivision (b), states that the petition must include: a declaration from the petitioner that he or she is eligible for relief under the statute, the superior court's case number and year of conviction, and a statement as to whether the petitioner requests appointment of counsel. (§ 1170.95, subd. (b)(1).) If any of the required information is missing and cannot "readily [be] ascertained by the court, the court may deny the petition without prejudice to the filing of another petition." (§ 1170.95, subd. (b)(2).)

Section 1170.95, subdivision (c), sets forth the trial court's responsibilities once a complete petition has been filed: "The court shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section. If the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner. The prosecutor shall file and serve a response within 60 days of service of the petition and the petitioner may file and serve a reply within 30 days after the prosecutor response is served. . . . If the petitioner makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause." (§ 1170.95, subd. (c).)

If the court issues an order to show cause, it must hold a hearing to determine whether to vacate the murder conviction. (§ 1170.95, subd. (d).) At that hearing, the prosecution has the burden of proving beyond a reasonable doubt that the petitioner is ineligible for resentencing. (§ 1170.95, subd. (d)(3).) The prosecutor and petitioner

8

"may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (*Ibid.*)

In short, a section 1170.95 petitioner must first make a prima facie case for relief, and if they are able to do so, the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction and recall the sentence. (See, e.g., *People v. Verdugo* (2020) 44 Cal.App.5th 320, 328, review granted Mar. 18, 2020, S260493.)  " 'A prima facie showing is one that is sufficient to support the position of the party in question.' " (*People v. Lewis*, *supra*, 43 Cal.App.5th at p. 1137, quoting *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 841.)

In this case, the trial court denied defendant's petition at the first stage of prima facie review under section 1170.95, subdivision (c).  "A denial at that stage is appropriate only if the record of conviction demonstrates that 'the petitioner is ineligible for relief as a matter of law.' [Citations.]  This is a purely legal conclusion, which we review de novo." (*Murillo*, *supra*, 54 Cal.App.5th at p. 167.)

B.     THE TRIAL COURT PROPERLY DENIED DEFENDANT'S PETITION

"To be eligible for resentencing under section 1170.95, [a defendant] must show that he 'could not be convicted of first or second degree murder because of changes to Section[s] 188 or 189 made effective' as a part of Senate Bill No. 1437.  [Citation.]  Under the newly amended version of section 189, a defendant can be convicted of felony murder only if he was the actual killer; acted with the intent to kill in aiding, abetting, counseling, commanding, inducing, soliciting, requesting, or assisting in first degree murder; or 'was a major participant in the underlying felony and acted with reckless

9

indifference to human life, as described in subdivision (d) of Section 190.2.' [Citation.] These are identical to the circumstances in which a felony-murder special circumstance applies. [Citation.] Thus, the jury's special circumstance finding shows as a matter of law that [defendant] could still be convicted of felony murder under the new definition, and prevents [defendant] from making a prima facie case that he is eligible for resentencing." (*Murillo*, *supra*, 54 Cal.App.5th at p. 167.)

Recently, two cases have found that "the proper remedy for challenging a special circumstance finding is by a petition for habeas corpus, not a petition for resentencing under section 1170.95." (*People v. Galvan* (2020) 52 Cal.App.5th 1134, 1137, 1142 (*Galvan*); *Murillo*, *supra*, 54 Cal.App.5th at pp. 167-168.) The Murillo court stated: "As we explained in *Galvan*, a defendant subject to a pre-*Banks* and *Clark* special circumstance is ineligible for resentencing under section 1170.95 because of the basis of his claim. Although [the defendant] asserts that he could not now be convicted of murder, 'the alleged inability to obtain such a conviction is not 'because of changes' made by Senate Bill No. 1437, but because of the clarification of the requirements for the special circumstances finding in *Banks* and *Clark*. Nothing about those requirements changed as a result of Senate Bill No. 1437. Just as was the case before that law went into effect, the special circumstance applies to defendants who were major participants in an underlying felony and acted with reckless indifference to human life. If [the defendant] is entitled to relief based on *Banks* and *Clark*, the avenue for such relief is not section 1170.95, but a petition for writ of habeas corpus.' " (*Murillo*, at p. 168.)

10

The *Murillo* court went on to state that "[b]y requiring a defendant to seek relief via habeas corpus, we avoid creating a *disparity* in which similarly situated defendants' cases are evaluated under different standards based solely on the date of their convictions. 'Defendants convicted after the Supreme Court issued its decisions in *Banks* and *Clark* would be required to challenge the sufficiency of the evidence of the special circumstance finding on direct appeal, where the People would need only to show that substantial evidence supported that finding. If the judgment is affirmed, generally it would be the law of the case in any proceedings thereafter as to those findings. [Citations.] But where, as here, a defendant was convicted before *Banks* and *Clark*, if the defendant could bring a collateral challenge under section 1170.95, the prosecution would be required to prove the special circumstance beyond a reasonable doubt. [Citation.] Yet nothing in the language of Senate Bill 1437 suggests that the Legislature intended unequal treatment of such similarly situated defendants.' " (*Murillo*, *supra*, 54 Cal.App.5th at pp. 168-169.)

We agree with both *Galvan* and *Murillo* and hold that the proper procedure for challenging a felony-murder special circumstance is a habeas petition. In the habeas petition, the court can determine whether the evidence is sufficient to find that defendant was a major participant who acted with reckless indifference to human life.

## DISPOSITION

We affirm the trial court's order denying defendant's petition.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER_____

Acting P. J.

We concur:

CODRINGTON_____

J.

FIELDS_____

J.